IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016

**JEFFERY W. DEAN v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Robertson County**
**No. 74CC2-2011-CR-267    William R. Goodman, III, Judge**

---

**No. M2015-01581-CCA-R3-PC – Filed November 14, 2016**

---

The Petitioner, Jeffery W. Dean, filed for post-conviction relief from his convictions of aggravated kidnapping and carjacking, alleging that his trial counsel was ineffective by failing to explain the State's evidence against the Petitioner and counsel's trial strategy and by failing to prepare the Petitioner to testify at trial.  The post-conviction court denied the petition, and the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

H. Garth Click, Springfield, Tennessee, for the Appellant, Jeffery W. Dean.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The Petitioner was charged with "the aggravated kidnapping and carjacking of the victim, Demetria Cantrell, from a Walmart parking lot in Springfield, Tennessee."  State v. Jeffery W. Dean, No. M2013-00340-CCA-R3-CD, 2013 WL 5775783, at *1 (Tenn. Crim. App. at Nashville, Oct. 24, 2013).  At trial, the parties stipulated that the Petitioner "was the individual wearing the yellow shirt that was on the premises of [Walmart] from

6:26 p.m. to 6:52 p.m. and who approaches [the victim] and entered her car on that date." Id. After the stipulation was announced, the victim testified that on the evening of September 24, 2010, she drove a 2003 silver Chevrolet Cavalier to Walmart and parked at the side of the building. Id. She entered the store, shopped, exited the store, and returned to her car. Id. As she was standing beside the driver's side door, she heard footsteps behind her and turned around. Id. She jumped and screamed, and the Petitioner looked in her eyes and threatened to kill her if she did not drive him where he wanted to go. Id. He appeared to be holding something under his shirt which the victim thought was intended to frighten her. Id. The victim got in the driver's seat, and the Petitioner got in the back seat. She asked "why he was doing this, and he replied that he did not want to scare her[,] but he was trying to escape from someone who was trying to 'jump'" him. Id. At the Petitioner's instruction, the victim drove them away from Walmart. Id. The Petitioner first said that he wanted to go to Taco Bell then instructed her to take him to Wendy's. Id. While the victim was driving, the Petitioner leaned forward and began looking at her purse, which was in the front passenger seat. Id. The victim thought the Petitioner was planning to rob her and asked whether he still wanted to go to Wendy's. The Petitioner "responded in the negative" and told her to drive straight. Id. The victim knew that if she kept driving, they would be in a rural area. Id. She was concerned, particularly because it was dark, she was alone, and she was petite. Id. The victim also found the Petitioner's demeanor threatening and thought she needed to escape. Id. While they were stopped at a red traffic light, she removed her seat belt, put the car in park, opened the door, and darted across the street, dodging traffic. Id. When she reached a parked sport utility vehicle (SUV) in the parking lot of a bar, she looked back and saw the Petitioner driving away in the car. Id. The victim hit the window of the SUV and pleaded for help. Id. at *2. Jason Bibb got out of the vehicle "and asked what was wrong." Id. at *1, 3. She quickly got into the vehicle and asked him to get in and lock the door. Id. Bibb complied, and the victim explained what had occurred. Id. Bibb called the police, and they came to the scene and took her home. Id. While at home, she realized that her purse was still in the car. Id. The purse contained her cellular telephone, and the police were able to find her vehicle by using the global positioning system (GPS) that was on the telephone. Id. at *1, 4. The car was found "close by" the home of the Petitioner's grandmother, where the Petitioner lived. Id. at *4. The car was damaged, and the victim's purse was gone. Id.

Springfield Detective Madison Burnett went to the victim's home to speak with her. Id. at *4. When the victim described the assailant, Detective Burnett recognized him as someone he spoke with earlier that day about an unrelated case. Id. Detective Burnett had photographed the people he spoke with in the other case and showed the photographs, which were on a digital camera, to the victim. Id. The victim identified the Petitioner from the photographs, and she identified him as the perpetrator in court. Id. at *1, 4. The police searched the Petitioner's grandmother's house and found the yellow

shirt the Petitioner had been wearing at Walmart on the night of the offense, as shown in the video surveillance footage.  Id. at *4.

The asset protection manager at Walmart testified about the security footage as it was shown to the jury; the footage was recorded on three videos.  Id. at *2.  She said that the first video showed the Petitioner's exiting a vehicle then walking into the store.  Id. Less than a minute later, the Petitioner came out of the store, opened the passenger door of the vehicle in which he had arrived, and had "'a confrontation'" with the driver of the vehicle.  Id.  The Petitioner slammed the door and went back inside the store.  Id.  The asset protection manager noted that the second video showed the Petitioner's "'stalking'" two other women before approaching the victim.  Id. at *3.  The second video also showed "the interaction between [the Petitioner] and the victim, as well as the car being driven away from Walmart."  Id.

The Petitioner testified and acknowledged that he had three prior aggravated assault convictions.  Id. at *5.  He asserted that he went to "Walmart on the night in question to borrow money from a friend who worked there."  Id.  He had an altercation with the person who drove him there, which "made him think that the driver would try to shoot him later."  Id.  The Petitioner said that he followed the victim to her car because he needed a ride and that he told her he needed to leave Walmart because someone was trying to kill him.  Id.  The Petitioner said the victim was "'spooked'" but that she agreed to give him a ride.  Id.  The Petitioner promised not to hurt her.  Id.  He acknowledged that he first asked the victim to drive him to Taco Bell but that he decided to go to Wendy's because a friend of his child's mother worked there.  Id.  The Petitioner explained that when he told the victim to drive straight, he meant for her not to drive past Wendy's.  Id.  The Petitioner said that he did not intend to take the victim's car but feared he would be taken to jail so he drove the car to his grandmother's house.  Id.  He denied taking anything from the car and suggested that neighbors who took drugs might have stolen the victim's belongings from the car.  Id.  The jury convicted the Petitioner of the charged offenses, and the Petitioner was sentenced as a multiple, Range II offender to concurrent sentences of thirteen years.  Id.

The Petitioner filed a pro se petition for post-conviction relief, alleging that his trial counsel was ineffective.  A lawyer was appointed, and an amended petition was filed.

At the post-conviction hearing, the Petitioner testified that originally he was represented by other attorneys but that trial counsel began representing him approximately six months prior to trial and continued through trial, sentencing, and the direct appeal.  The Petitioner said that trial counsel met with him and tried to explain what was happening in his case.  The Petitioner acknowledged that trial counsel provided

him with discovery materials, which included witness statements and security videos, and that trial counsel reviewed the materials with him.

When asked if trial counsel employed an investigator, the Petitioner responded that trial counsel's secretary made a call to Walmart but that he knew of no other investigation.

The Petitioner said that the State had offered to allow him to plead guilty and to receive a sentence of either twelve, ten, or nine years. The Petitioner said that he knew he could be convicted at trial but that he never considered accepting a plea agreement.

The Petitioner said that he did not know prior to trial that trial counsel had agreed to stipulate the Petitioner's identity and that he learned of the stipulation during voir dire. The Petitioner stated that he did not know what the stipulation meant. If he had known that trial counsel would stipulate his identity and that he would have to testify at trial, he "probably" would have accepted the State's plea offer of nine years with release eligibility after serving eighty-five percent. Nevertheless, he acknowledged that he told trial counsel that he wanted a jury trial and requested that counsel file a motion to have the Walmart surveillance videos suppressed.

The Petitioner acknowledged that he had three prior felony convictions. Trial counsel advised him that he would be sentenced as a standard, Range I offender because the offenses occurred within a twenty-four-hour period; however, the Petitioner was sentenced as a multiple, Range II offender. The Petitioner said that he did not understand the differences between sentencing ranges. He said that he "might have" seen the presentence report prior to the sentencing hearing but that he did not recall whether trial counsel reviewed the report with him.

The Petitioner said that trial counsel did not discuss trial strategy with him. The Petitioner acknowledged that he knew prior to trial that he would testify. The Petitioner told trial counsel that he did not think he would be a good witness, but trial counsel insisted that the Petitioner's testifying was the only way to prove his innocence and that he "had no choice." Trial counsel told the Petitioner that he did not need to be "prepped" to testify because the Petitioner needed only to tell the truth.

On cross-examination, the Petitioner reiterated that he was represented by a public defender prior to trial counsel. The public defender "somewhat" advised the Petitioner of the evidence against him. The Petitioner denied knowing that the State was seeking to sentence him as a multiple, Range II offender or that he would have to serve one hundred percent of an aggravated kidnapping sentence in confinement.

The Petitioner said that he had no complaint about how often trial counsel met with him and that trial counsel had reviewed all of the State's evidence with him. The Petitioner acknowledged that the State had a photograph taken on the day of the offenses which showed the Petitioner's tattoos and clothing. The Petitioner further acknowledged that the victim's description of the perpetrator's clothing and tattoos matched the Petitioner. The Petitioner conceded that the victim's car was found approximately one-half mile away from his grandmother's house. The Petitioner contended that the clothing found at his grandmother's house did not match the clothing described by the victim or shown on the security videos.

The Petitioner agreed that his testimony was the only way to contradict the victim's testimony. The Petitioner said that he had not intended to kidnap the victim and that the incident was a "misunderstanding"; however, the Petitioner asserted that trial counsel "could have argued identity" if he had not agreed to the stipulation. The Petitioner agreed that trial counsel could not have argued simultaneously that the Petitioner was not the perpetrator and that the victim misunderstood the Petitioner's intentions.

The Petitioner said that trial counsel showed him the Walmart security videos, but the Petitioner contended that he could not be identified from the videos. Nevertheless, he acknowledged that his "dimensions" and tattoos matched the description given by the victim.

The Petitioner conceded that he knew he had the right to choose not to testify. He maintained that he did not want to testify but that he had felt it was the only way to prove his innocence. The Petitioner said that he was sentenced at the "low part of the range."

On redirect examination, the Petitioner said that the public defender withdrew after the Petitioner lodged a complaint against him and that two other attorneys had to withdraw because of conflicts.

The Petitioner reiterated that at the time he declined the State's plea offers, he did not know that trial counsel's defense strategy required that he testify or that trial counsel intended to stipulate his identity, which he contended was "most of the case for the State." The Petitioner said that if he had known the trial strategy, he was "pretty sure" he would have reconsidered the State's plea offers, especially because he knew he was not a good witness. The Petitioner also opined that by stipulating his identity, "that's pretty much saying I'm guilty."

Trial counsel testified that he had been licensed to practice law since 1989 and that his practice was primarily criminal defense. He thought that the Petitioner's previous attorneys withdrew because they disagreed with the Petitioner about how to handle his

case and that they "probably" tried to pressure the Petitioner to plead guilty. As a result, trial counsel knew he needed to communicate with the Petitioner about how to proceed. Trial counsel said that he met with the Petitioner frequently and reviewed the discovery materials with him. Trial counsel did not hire an investigator but had his paralegal interview the victim.

Trial counsel did not think that challenging the Petitioner's identity was a viable defense. The only defense trial counsel could discern was "that it was a mistake, a huge mistake. The weirdest mistake a jury could imagine." He noted the victim's acknowledgment that the Petitioner told her he was not trying to hurt her and that he tried to "put her at ease," which supported the defense of misunderstanding. Additionally, the Petitioner's claim of misunderstanding was supported by the victim's testimony that the Petitioner asked only that she take him to Taco Bell and Wendy's. Trial counsel thought that the case would be difficult to win but that the jury might find the Petitioner's testimony credible. Trial counsel said that in his experience, alternative defenses were usually not successful. Accordingly, he never thought about arguing misunderstanding while simultaneously challenging identity. Trial counsel said that he talked with the Petitioner "incessantly about the defense" and asserted that the Petitioner knew how the defense would be presented.

Trial counsel said that he did not force the Petitioner to testify but "strongly advised" him that his testimony was necessary to convince the jury that what happened was a misunderstanding. Trial counsel also told the Petitioner that without his testimony, if he did not testify, the victim's testimony would be unrefuted.

Trial counsel said that in the victim's statement to the police and during the preliminary hearing, the victim gave a description of the perpetrator that matched the Petitioner, including his tattoos. The Petitioner's identity was further established by security videos and by the photograph taken by the police hours before the offenses in relation to a different case; the videos and photograph showed the Petitioner wearing the same clothes and having the same tattoos as the victim described.

Trial counsel recalled that the State made various plea offers, including "eight to nine years at 30 percent to serve." Trial counsel conveyed the offers to the Petitioner. Trial counsel advised the Petitioner of the charges he was facing and the potential sentences, depending on the Petitioner's sentencing range. He further advised the Petitioner that the sentences offered by the State were more favorable than he would receive if convicted at trial.

On cross-examination, trial counsel reiterated that he thought the best strategy was to stipulate identification and have the Petitioner testify about the misunderstanding. The Petitioner expressed his concerns about testifying, but trial counsel thought the Petitioner

- 6 -

would be a good witness and that he sounded honest. Trial counsel said that he "prepped" the Petitioner to testify but that they did not "rehearse[]" because he did not want the Petitioner's testimony to "sound[] canned."

Trial counsel could not recall discussing the identity stipulation with the Petitioner. He said that if he had raised the issue with the Petitioner, he would have explained that simultaneously proceeding on the alternative defenses of identity and misunderstanding would damage the Petitioner's credibility with the jury.

After the hearing, the post-conviction court entered a written order denying the petition. The court found that the Petitioner had failed to prove that trial counsel was deficient or that the Petitioner was prejudiced by any alleged deficiency. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the

petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner relies on this court's opinion in State v. Joseph Newton, No. M2014-00603-CCA-R3-CD, 2015 WL 1543386, at *6 (Tenn. Crim. App. at Nashville, Apr. 2, 2015), appeal denied (Tenn., July 17, 2015), which states that "a defendant has a right to choose a defense strategy and to reject counsel's advice regarding adverse consequences of that strategy." We conclude that Newton is not applicable. In Newton, trial counsel and the defendant, who was charged with rape, had agreed to pursue a defense of consent based on the State's strong proof of identity and further agreed that the defendant would not testify. Id. However, at trial, the defendant insisted on testifying and challenging identity, and trial counsel complied. Id. After being convicted, the defendant claimed trial counsel should have relied on consent as a defense. Id. On appeal, this court stated that the attorney would not be found deficient for acceding to the defendant's demand that a particular defense, even if ill-advised, be pursued. Id.

At the instant post-conviction hearing, trial counsel testified that he and the Petitioner discussed the State's evidence. Trial counsel asserted that the State had an abundance of evidence establishing the Petitioner's identity, including a photograph and the security videos. Accordingly, trial counsel opined that a defense of mistaken identity was not plausible. Trial counsel determined instead that the only defense available was that the victim misunderstood the Petitioner's intent. Trial counsel thought that the Petitioner's "story" was so "weird" the jury would find it believable. During numerous pretrial meetings, trial counsel and the Petitioner discussed the proposed defense, and trial counsel explained to the Petitioner that he needed to testify in order to establish the defense of misunderstanding.

As the post-conviction court stated, the Petitioner's "primary complaint appears to be that his counsel advised him to tell the truth. It appears that counsel presented a defense based upon the description of the event [given] by [the Petitioner]." Moreover,

- 8 -

the record reveals that the Petitioner did not testify at the post-conviction hearing that he was opposed to the defense of misunderstanding and that he wanted to instead, or in addition, pursue a defense of mistaken identity. Notably, at trial and at the post-conviction hearing, the Petitioner acknowledged that he was in Walmart and that he was in the car with the victim. The Petitioner was simply upset that counsel stipulated his identity, which he thought simplified the State's case. Regarding the Petitioner's claim that trial counsel did not prepare him to testify, trial counsel explained that the Petitioner was a good witness and that he thought the Petitioner would seem more believable if they did not "rehearse" his testimony.

This court has stated that, "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsel's behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Generally, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). We conclude that the post-conviction court did not err by finding that the Petitioner failed to prove by clear and convincing evidence that his trial counsel was ineffective in this regard.

The Petitioner also complains that if he had known about the trial strategy prior to trial, he would have accepted one of the State's plea offers. However, at the post-conviction hearing the Petitioner testified that he was unwilling to accept a guilty plea because he was innocent and that he wanted a jury trial. Moreover, trial counsel testified that he and the Petitioner frequently discussed the trial strategy and that the Petitioner understood the decision. The post-conviction court accredited trial counsel's testimony and found that his performance was not deficient. See State v. Richard Beheler, No. E2009-00120-CCA-R9-CD, 2010 WL 271284, at *5 (Tenn. Crim. App. at Knoxville, Jan. 25, 2010). We agree.

### III.  Conclusion

We conclude that the post-conviction court did not err by denying post-conviction relief. The judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE